## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 18-24109-JAD |
| | ) | |
| **BRADLEY S. SWIGER,** | ) | Chapter 13 |
| | ) | |
| Debtor. | ) | |
| —————————————X | ) | |
| | ) | |
| **VICKY L. MANSFIELD,** | ) | Adversary No. 19-02015-JAD |
| | ) | |
| Plaintiff, | ) | Related to ECF No. 1 |
| | ) | |
| -v- | ) | |
| | ) | FILED |
| **BRADLEY S. SWIGER, and** | ) | 3/7/24 1:38 pm |
| **RONDA J. WINNECOUR,** | ) | CLERK |
| **CHAPTER 13 TRUSTEE,** | ) | U.S. BANKRUPTCY |
| | ) | COURT - WDPA |
| Defendants. | ) | |
| —————————————X | ) | |
| | ) | |
| **BRADLEY S. SWIGER,** | ) | Adversary No. 19-02009-JAD |
| | ) | |
| Plaintiff, | ) | Related to ECF No. 1 |
| | ) | |
| -v- | ) | |
| | ) | |
| **VICKY L. MANSFIELD,** | ) | Adversary Nos. 19-02009-JAD and |
| | ) | 19-02015-JAD are consolidated at |
| Defendant. | ) | Adversary No. 19-02009-JAD |
| —————————————X | ) | |

## MEMORANDUM OPINION

The matter before the Court is a consolidated adversary proceeding regarding the dischargeability of an alleged debt(s) due from Bradley S. Swiger (the "Debtor") to Ms. Vicky L. Mansfield (collectively, the "Parties"). The Debtor and Ms. Mansfield were formerly married. The gist of the action is that Ms. Mansfield contends that the Debtor fraudulently induced or caused Ms.

Mansfield to be an obligor on certain Parent PLUS student loans which funded the college education of one of their children.  Given this alleged fraudulent conduct, Ms. Mansfield contends that the debts due Ms. Mansfield from the Debtor on account of the same is excepted from discharge pursuant to 11 U.S.C. section 523(a)(2)(A).[1]

## I.

This *Memorandum Opinion* constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7052.  For the reasons set forth below, the Court concludes that certain of the Parent PLUS loans were procured by the Debtor as a result of fraudulent representation, and therefore liability of the Debtor to Ms. Mansfield on account of the identified loans is determined to be non-dischargeable pursuant to 11 U.S.C. section 523(a)(2)(A).[2]

## II.
## The Facts Adduced at Trial

On November 14, 2023, the Court conducted a trial on this matter, at which numerous exhibits were admitted into evidence.  In addition, Ms.

---

[1] This consolidated adversary proceeding is a core proceeding, see 28 U.S.C. § 157(a)(2)(I), and this Court has the requisite subject-matter jurisdiction to hear and decide this matter on a final basis. See 28 U.S.C. §§ 157 and 1334.

[2] At trial, counsel for the Debtor and Ms. Mansfield represented that the only matter at issue is whether the debt owed to Ms. Mansfield is nondischargeable under section 523(a)(2) of title 11. Transcript of November 14, 2023 Hearing ("Hr'g Tr."), ECF No. 86, 9:9-21.

Mansfield, the Debtor, Ms. Amanda Swiger (the Parties' adult daughter), and attorney Scott Kasbee (who was Mr. Swiger's divorce lawyer) testified.

 The following facts were adduced at trial:

1. The Parties were married on March 7, 1993, and separated on September 1, 2014. *Stipulation of the Parties* ("Stipulation"), ECF No. 81 ¶2.

2. The Parties have two children, one of which is Amanda Swiger. Stipulation ¶2.

3. Amanda Swiger enrolled at Saint Francis University for the fall 2011 semester, and thereafter transferred to the Pennsylvania State University for the spring 2012 semester where she completed her college education.

4. In order to finance some of the expense of Amanda's college education, certain Parent PLUS loans (the "Loans") were obtained. The Loans form the basis of the debt at issue in this case.

5. The Loans were disbursed on October 10, 2011, January 15, 2012, August 22, 2012, August 18, 2013, and August 18, 2014. *Defendant's Proposed Exhibits* (the "Mansfield Exhibits"), ECF No. 76, 25.[3] See also Hr'g Tr. 23:6-10.

6. The Parties dispute exactly whom applied for the Loans and dispute the agreements between the Parties with respect to the same.

7. Ms. Mansfield avers that the agreement of the Parties was that the Loans were to be joint obligations of the Parties.

8. The Debtor testified that because Ms. Mansfield had put their older daughter's student loans in her (Ms. Mansfield's) name, the initial plan was for the loans for Amanda to be put in the Debtor's name. He denied that there was a discussion about putting Amanda's loans in both Parties' names. Hr'g Tr. 78:14-22.

---

[3] Pinpoint page numbers in the citations to the Mansfield Exhibits refer to the bates stamp numbering located at the bottom, center of the page.

9.  Ms. Mansfield avers that it was the Debtor, and not her, who applied for the Loans, while the Debtor maintains it was Ms. Mansfield who applied for them.

10. Ms. Mansfield testified that she authorized the Debtor to sign her name to the Loans with the understanding that both Parties would be liable for them. Hr'g Tr. 21:14-18 & 133:2-8.

11. Ms. Mansfield stated that she relied on the Debtor's promise to apply for Amanda's student loans jointly in giving the Debtor verbal authority to sign her name to the Loan applications. *Affidavit of Vicky Mansfield in Opposition to the Motion for Summary Judgment Filed by Bradley S. Swiger* (the "Mansfield Affidavit") ¶¶6-7, included in the Mansfield Exhibits at 266-270.

12. Ms. Mansfield testified that responsibility for applying for the Loans was allocated to the Debtor because Ms. Mansfield had little understanding of the student loan process and it stressed her out, and because she considered her then-husband (the Debtor) to be more experienced and knowledgeable with respect to student loans. Hr'g Tr. 21-22 & 47:9-12.

13. The Debtor's educational and employment background is as follows. The Debtor graduated high school in 1985 and thereafter attended community college where he studied culinary arts. After working in food service, the Debtor attended Robert Morris University and graduated in 2001 with a Bachelor of Science degree in economics. The Debtor then obtained a Master's Degree and certification in education in 2003. At that point, the Debtor was employed in the education sphere as a substitute teacher and teacher's aide, before becoming an economics teacher. The Debtor sought additional certification from Duquesne University to become an administrator. In 2011, the Debtor began working on a doctoral program and earned his Doctorate in Education in 2014. Hr'g Tr. 100-103; Deposition Transcript 10-11, included in the Mansfield Exhibits at 282-358.

4

14. The Debtor applied for his own personal student loans in May of 2011. Hr'g Tr. 83:1-3.

15. Ms. Mansfield's educational and employment background is as follows. Ms. Mansfield obtained her GED at age 16 in 1987. Thereafter, she was generally employed as a nurse's aide. In 2000, Ms. Mansfield completed the registered nurse program at the Community College of Allegheny County and began working as a registered nurse. She remained in that employment as of the date of the trial. Prior to the COVID-19 pandemic, Ms. Mansfield began taking online courses to obtain a Bachelor's Degree in nursing. Although not expressly stated, it was inferred at trial that Ms. Mansfield did not complete this program. Hr'g Tr. 41-43.

16. Ms. Mansfield testified that she had virtually no experience with the student loan process, explaining that the applications for the student loans secured for her own education were primarily completed by her college's financial office and that she just "signed the papers." Hr'g Tr. 21:6-9 & 26-27. See also Hr'g Tr. 24:4-9 (stating that she "put in a PIN" for her student loan applications).

17. Ms. Mansfield stated that she was "severely, chronically ill" during the time Amanda's student loans were applied for and due to her illness, Ms. Mansfield authorized the Debtor to apply for Amanda's student loans "with the specific condition that the loans were to be made in our joint names, so that both of us would be jointly liable for the student loans." Mansfield Affidavit ¶5.

18. Ms. Mansfield testified that between 2011 and 2014, she experienced health issues including a bilateral equinus deformity in both feet, which inhibited her ability to walk; she was hospitalized with neurotoxicity; she had three abdominal surgeries, the last of which resulted in her being admitted to intensive care for one month; she experienced asthma issues; and experienced severe back pain. Hr'g Tr. 56-57.

19. According to the loan documents evidencing the Loan, Ms. Mansfield is the sole obligor on the Loans.

20. Introduced as an exhibit at trial is a *Federal Direct PLUS Loan Application and Master Promissory Note* dated October 1, 2011 (the "<u>Master Promissory Note</u>"). Mansfield Exhibits 56-65. The Master Promissory Note is in the name of Ms. Mansfield and identifies Amanda Swiger as the "Dependent Undergraduate Student." Master Promissory Note ¶¶ 5 & 14.

21. The Debtor denies that he applied for any of the Loans in Ms. Mansfield's name and asserts that he did not assist Ms. Mansfield in applying for the Loans. Hr'g Tr. 92-93.

22. Ms. Mansfield testified that the Loans were applied for by Amanda and the Debtor together. Hr'g Tr. 14:11-16.

23. Amanda Swiger testified that she remembered applying, together with the Debtor, for some of her personal student loans and some of the Parent PLUS Loans. Hr'g Tr. 61-66.[4]

24. Amanda Swiger testified that she personally observed her father place Ms. Mansfield's name on the Loan applications on at least two occasions in the summers prior to her freshman and sophomore years (2011 and 2012). Hr'g Tr. 64-67.

25. Amanda Swiger testified that the Debtor told her that he was placing the Loans in Ms. Mansfield's name. Hr'g Tr. 68-69. The Debtor denies this, testifying that he told Amanda that Ms. Mansfield would have to apply for the Loans. Hr'g Tr. 88:13-18.

26. Amanda Swiger testified that she was able to differentiate between her personal student loans and the Loans at issue (which are Parent PLUS loans), because for her personal student loans she "went to a bank" and that her grandmother was the co-signer. Hr'g Tr. 65-66.

27. Amanda Swiger testified that the Debtor had access to the PIN used in the student loan application process that was kept in a filing cabinet next to the computer. Hr'g Tr. 68:16-23.

---

[4] Amanda testified that she could not remember applying for her student loans after her sophomore year. Hr'g Tr. 64:21-23.

28. Amanda Swiger testified that the Debtor stated to her on at least two occasions—in the summers of 2011 and 2012—that he could not qualify to sign for her student loans. Hr'g Tr. 74:7-25.

29. The Debtor testified that he assisted Amanda with her Free Aplication for Federal Student Aid ("FAFSA"). Hr'g Tr. 78-79.

30. The Debtor testified that the parent portion of Amanda's FAFSA was completed when he "sat down with [Amanda]." Hr'g Tr. 105:4-12.

31. Also, that he believes he sat down with Ms. Mansfield "a time or two" to complete Amanda's FAFSAs. Hr'g Tr. 113:14-24. Ms. Mansfield denied this happened. Hr'g Tr. 134:14-18.

32. Ms. Mansfield testified that the Debtor affirmatively stated to her that Amanda's student loans "were going to be done with both of us, that the loans were supposed to be for both of us and we were both responsible for them." Hr'g Tr. 47-48.

33. Ms. Mansfield testified that the statements were "ongoing," (Hr'g Tr. 48:8-16), but that in 2012 the Debtor affirmatively stated that the Loans would be in both names. Hr'g Tr. 50:9-12.

34. Ms. Mansfield avers that the Debtor represented to her that he had applied for Amanda's student loans jointly and that the Parties were both liable for the Loans. Mansfield Affidavit ¶9.

35. Ms. Mansfield avers that she justifiably relied on the Debtor's representation. Mansfield Affidavit ¶11.

36. The Debtor applied for and was denied a Parent Plus Loan prior to Amanda's fall 2011 semester. See Mansfield Exhibits 276-77.

37. The Debtor informed Ms. Mansfield that his application for the 2011 Parent PLUS loan was denied, and Ms. Mansfield was aware that she would be solely liable on that obligation. Hr'g Tr. 16-17 & 49-50.

38. Ms. Mansfield testified that after the 2011 Parent PLUS loan, the Debtor never indicated that he was declined for other Parent PLUS loans. Hr'g Tr. 50:6-8.

39. The Debtor testified that he only applied for a Parent PLUS loan in his name on one occasion. Hr'g Tr. 82:4-7.

40. Ms. Mansfield testified that she did not discover that the Loans were solely in her name until after the Parties separated. Hr'g Tr. 16:1-7. Ms. Mansfield testified that prior to separation, the Debtor represented that the Loans were "equal liabilities for [the Parties.]" Hr'g Tr. 16:15-18.

41. Between September 8, 2011 and November 20, 2014, FedLoan Servicing, the Loan servicer, mailed correspondence addressed to Ms. Mansfield to the Parties' marital residence. *Plaintiff's Proposed Exhibits* (the "Debtor's Exhibits"), ECF No. 78, Ex. 25, at ECF pp. 141-229.[5]

42. FedLoan Servicing mailed third-party authorization forms to Ms. Mansfield at the Parties' residence on September 18, 2012, February 7, 2014, and February 8, 2014. The February 8, 2014 correspondence included the statement that: "BRADLEY SWEIGER [sic] recently contacted us in regard to your student loan account. However, we did not disclose any information regarding your account because we have no record that you authorized us to release any information to this individual." Debtor's Exhibits, Ex. 16, at ECF pp. 99-105.

43. Correspondence regarding deferments on Ms. Mansfield's account with FedLoan Servicing was sent to the Parties' residence on January 12, 2012, October 3, 2012, December 29, 2012, June 18, 2013, and February 13, 2014. Ms. Mansfield testified that she was not aware of what was going on with the Loans at those points in time. Hr'g Tr. 31-33. The Debtor denies applying for the deferments. Hr'g Tr. 99:20-24.

44. Ms. Mansfield testified that she did not recall requesting any deferments until after the time of separation. Hr'g Tr. 32:4-8.

---

[5] The Debtor's Exhibits are filed on the docket as a single, combined pdf. For ease of reference, pinpoint citations to the Debtor's Exhibits may be to the ECF page number and not the page numbers of the individual exhibits/documents. Such designation shall be noted by "ECF p." preceding a pinpoint citation.

45. Ms. Mansfield testified that she did not receive the letters from the Loan servicer mailed to her shared address with the Debtor prior to the Parties' separation.  Hr'g Tr. 29:3-15.

46. Ms. Mansfield testified that (in response to a question regarding mail received between January 12, 2012 and February 13, 2014), the Debtor would get home before Ms. Mansfield and "took care of the mail, the bills, everything." Hr'g Tr. 40:14-21.

47. The Debtor testified that mail delivered to the residence was placed in a household mail basket. Hr'g Tr. 104:16-19.

48. Ms. Mansfield testified that it is possible she received e-mails from the student loan servicer prior to her separation, but she did not "look at most of that stuff" because she was working approximately 70 hours per week and was ill, and that because the Debtor was "caring for" the finite details, she "trusted that what he said was actually happening." Hr'g Tr. 56:10-22.

49. During the course of their divorce proceedings, the Parties entered into a settlement by which the Debtor agreed to be solely responsible for Amanda's student loans. Stipulation ¶2. That *Consent Order of Court* was dated May 16, 2016 (the "Consent Order"). The Consent Order is included in the Mansfield Exhibits at 271-275.

50. The Consent Order provides, in part, that: "Husband shall be solely responsible for the chil[d] Amanda's Loan which are currently in Wife['s] name. He will assume the entire balance, hold Wife harmless of this obligation and make monthly payments directly to Fed Loans. . . ." Consent Order ¶7(a).

51. The obligation to pay the Loans imposed by the Consent Order is the debt which Ms. Mansfield seeks to find is non-dischargeable and the Debtor seeks to discharge.

52. The Debtor failed to make the payments on the Loans and contempt proceedings were initiated in state court.

53. An enforcement hearing was held before Master Melaine S. Rothey on September 11, 2018 (the "Enforcement Hearing").   See Transcript of Enforcement Hearing ("Enforcement Hr'g Tr."), included in Debtor's Exhibits as Ex. 26, ECF pp. 296-420.

54. At trial, Ms. Mansfield introduced as an exhibit a credit report dated September 12, 2023, in which the total amount of the consolidated Loans was reported as being $83,489. Mansfield Exhibit 189. See also Hr'g Tr. 19-20.

55. Ms. Mansfield testified that if the Debtor had told her in 2012 that he could not co-sign the Loans, that she did not know what she would have done, and that she "probably would have ended up going to a bank [her]self and trying to see what, if any, options were out there privately . . . ." Hr'g Tr. 133:14-19.

56. The Debtor testified that the Parties probably had a physical file for each of their children's student loan information, but all of "that stuff" was destroyed when the Parties separated. The Debtor testified that he did not know whether it was Ms. Mansfield or himself who had possession of the documents when they were disposed of. Hr'g Tr. 108-109.

57. The Debtor testified that he destroyed documents related to liabilities that were in his name. Hr'g Tr. 110-111.

58. Ms. Mansfield testified that prior to separation, the Parties' had a keyed, file cabinet in their home office and that the Debtor maintained meticulous files. However, when she went to retrieve documents at the request of her divorce counsel, she discovered that all of the legal documents had been removed. Hr'g Tr. 131-132.

59. Counsel for Ms. Mansfield conducted a deposition of the Debtor on May 8, 2019.

60. At the deposition, the Debtor stated in response to Counsel's question asking "Did you ever make any payments for Amanda's student loans?" that "I had been make [sic] some payments, yes. However, during that time I thought—it was my understanding that the loans were in deferment

which is why I had not been making full payments on those." Deposition Transcript 15:8-14. However, when asked to clarify what period of time he believed the loans were in deferment, he stated that he did not "have that privy with me at this time." Deposition Transcript 15:15-19.

61. It was highlighted in the Deposition Transcript that Master Rothey found the Debtor's assertion that he believed the student loans to be in a two-year deferment "incredible" in light of text messages between the Parties wherein the Debtor was informed that the lender only granted a three-month deferment. Deposition Transcript 21:16-23.

62. The Debtor maintained at the deposition that he did not recall exchanging the text messages with Ms. Mansfield, but testified that he did look at the messages at the Enforcement Hearing. Deposition Transcript 21-22.[6]

63. At the Debtor's request, Ms. Mansfield consolidated the Loans. Hr'g Tr. 17:18-22.

64. At trial, Ms. Mansfield admitted as part of her exhibits, an email exchange between Ms. Mansfield and the Debtor on April 18, 2017 in which Ms. Mansfield wrote to the Debtor: "Brad, I just put in for a standard 30 year consolidation loan on Amanda's accounts through Fed Loans. When the paperwork goes through I will update you." To which the Debtor responded, "Thank you[.]" Mansfield Exhibits 84-85.

65. Ms. Mansfield also admitted copies of text messages between the Parties.[7] On April 18, 2017, the same date as the emails, Ms. Mansfield[8] wrote "I

---

[6] The Enforcement Hearing was also referred to as the "contempt hearing" at the Debtor's deposition. See, e.g., Deposition Transcript 19:13-15 (referring to the September 11, 2018 hearing as the "contempt hearing").

[7] The copies of the text messages do not include party identifiers. However, the text messages were included in the Mansfield Exhibits and labeled in the index as part of the "April 18, 2017 Vicky emails and texts to Bradley re consolidation [o]f Amanda's loans[.]" The Mansfield Exhibits were admitted without objection.

[8] The copies of the text messages do not include party identifiers. However, the Court is able to ascertain the identity of the sending/receiving parties based on the contents of the communications. For example, the party who stated "I need to talk to you about AJ loans[,]" also wished the other party "Happy birthday" on March 7, 2017. The Debtor's birthday is March 7th. Deposition Transcript 6:3-4.

need to talk to you about AJ loans[,]" to which the Debtor responded "Extended please. Then I need the acct number[,]" followed by a second text reading "30 year plan[.]" Mansfield Exhibits 86.

66. At the Enforcement Hearing, Ms. Mansfield testified that the Debtor requested that she consolidate the loans and the Debtor "specifically asked for the 30-year consolidation." Enforcement Hr'g Tr. 11:7-24.

67. At the Enforcement Hearing, the Debtor answered affirmatively when asked whether Ms. Mansfield "did exactly what you asked her to do[,]" in obtaining the 30-year consolidated loan term. Enforcement Hr'g Tr. 80:1-11.

68. At his deposition, the Debtor testified that he did not recall asking Ms. Mansfield to consolidate the loans in May 2017. Deposition Transcript 21:5-9.

69. At the Enforcement Hearing, Ms. Mansfield testified that if she had known the Debtor would not pay the Loans, that she would not have agreed to the Consent Order. Enforcement Hr'g Tr. 46:6-12.

### III.
### Application of *Archer v. Warner*

There is no dispute that the Consent Order was intended to settle any outstanding claims between the Parties regarding liability for the Loans procured to fund Amanda's college education. Additionally, both Parties acknowledge that Archer v. Warner governs any questions about the dischargeability of the debt in these circumstances.[9]

---

[9] While the Debtor acknowledges the holding in Archer, the Debtor contends that "because all claims have been settled, including any potential claim of fraud[,]" no further inquiry is necessary. *Bradley S. Swiger's Pre-Trial Narrative Statement and/or Pre-Trial Memoranda*, ECF No. 84, 7. Debtor previously asserted this argument at the summary judgment stage and the Court addressed it in its opinion issued July 24, 2020. Mansfield v. Swiger (In re Swiger), 617 B.R. 537, 544-45 (Bankr. W.D. Pa. 2020). In that opinion, this Court found that the Debtor "failed to show that Archer is inapplicable. As such, inquiry into the Debtor's allegedly fraudulent conduct in applying for the [Loans] forming the basis of the Mansfield Debt is permitted in this matter." 617 B.R. at 545. While this Court couched its conclusion as being "for purposes

In <u>Archer</u>, the Supreme Court of the United States permitted the parties to look past their settlement agreement and releases to examine the facts and circumstances giving rise to the debt owed by the defendants. 538 U.S. 314, 323 (2003); <u>Bounds v. Mullins (In re Mullins)</u>, No. 16-11032 (BLS), Adv. No. 16-51034, 2017 WL 3705071, at *3 (Bankr. D. Del. 2017). In so holding, the Supreme Court noted its prior decision in <u>Brown v. Felsen</u> wherein the Supreme Court stated that "the mere fact that a conscientious creditor has previously reduced his claim to judgment should not bar further inquiry into the true nature of the debt[.]" <u>Archer</u>, 538 U.S. at 320-21 (quoting <u>Brown v. Felsen</u>, 442 U.S. 127, 138 (1979)).

Indeed, in <u>Archer</u> the case led to an inquiry about whether money was obtained by fraud, false representation, or false pretenses, which is precisely the issue before the Court today.

Accordingly, the Court will examine the facts giving rise to the debt owed to Ms. Mansfield by the Debtor through the lens of section 523(a)(2)(A).

## IV.
## <u>Standards for Exceptions to Discharge Pursuant to 11 U.S.C. § 523(a)(2)(A) and Burden of Proof With Respect to the Same</u>

> The Bankruptcy Code strikes a balance between the interests of insolvent debtors and their creditors. It generally allows debtors to discharge all prebankruptcy liabilities, but it makes exceptions when, in Congress's judgment, the creditor's interest in recovering a particular debt outweighs the debtor's interest in a fresh start.

---

of summary judgment[,]"(<u>id.</u>) the Debtor has advanced no additional argument that would warrant a different outcome at this juncture. Accordingly, this Court incorporates its prior discussion and again finds <u>Archer</u> applicable.

Bartenwerfer v. Buckley, 598 U.S. 69, 72, 143 S. Ct. 665, 670, 214 L. Ed. 2d 434 (2023).

One such exception is where a debt was ". . . obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" 11 U.S.C. §523(a)(2)(A). Under those circumstances, the debt is nondischargeable. "[T]he purpose behind section 523(a)(2)(A) is 'to prevent a debtor from retaining the benefits of property obtained by fraudulent means and to ensure that the relief intended for honest debtors does not go to dishonest debtors.' " Smith v. Johnson-Battle (In re Johnson-Battle), 599 B.R. 769, 782 (Bankr. D.N.J. 2019)(quoting  Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010) (internal citations omitted)).

Like other exceptions to discharge under section 523, persons seeking to except a debt from discharge under section 523(a)(2)(A) must show that the exception is applicable by the preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291 (1991).

Even though the Debtor commenced one of the adversary proceedings and is the plaintiff listed therein, it is Ms. Mansfield who carries this burden of proof. See Imel v. U.S., I.R.S. (In re Imel), 169 B.R. 37, 38 (Bankr. W.D. Tex. 1994)(in context of motion to realign parties in a nondischargeability proceeding, observing that "even though the debtor has initiated this action, essentially seeking essentially declaratory relief, the nature of the determination is such

that the creditor is the party with the true burden of proof and with the obligation
to go forward with evidence").

In distinguishing between a false pretense, a false representation, and
actual fraud, it has been observed that: "A false representation requires an
express statement while false pretenses are the result of an implied
misrepresentation or conduct by a debtor that fosters a false impression." Dolfi
v. Dolfi (In re Dolfi), 605 B.R. 385, 393 (Bankr. W.D. Pa. 2019)(citation omitted).
"Actual fraud" includes forms of fraud "that can be effected without a false
representation[,]" such as fraudulent conveyance. Husky Int'l Elecs., Inc. v. Ritz,
578 U.S. 355, 359, 136 S.Ct. 1581, 1586 (2016). "Actual fraud can be shown
where debtor acted with wrongful intent enabling debtor to obtain money or
property as part of a fraudulent scheme." In re Dolfi, 605 B.R. at 393 (citation
omitted).

While Ms. Mansfield avers nondichargeability on the basis of "false
pretenses, a false representation or actual fraud" broadly (see, e.g., *Defendant's
Answer to Plaintiff's Complaint to Determine Dischargeability*, 19-02009-JAD,
ECF No. 4, ¶6), the particulars of Ms. Mansfield's allegations against the Debtor
are phrased in terms of false representations. See *Adversary Complaint Objecting
to Dischargeability*, 19-02015-JAD, ECF No. 1 ¶28 ("Debtor knowingly made false
representations to Plaintiff . . . ."); *Defendant Vicky Mansfield's Pretrial
Memoranda* ("Mansfield Pretrial Memoranda"), 19-02009-JAD, ECF No. 75, 5
(averring that the Debtor made a representation he knew to be false, and that

Ms. Mansfield justifiably relied on that misrepresentation and sustained damages).

To demonstrate that a false representation has occurred such as to warrant section 523(a)(2)(A) relief, the following elements must be satisfied:

> (1) the debtor made a false representation; (2) the debtor knew at the time that the representation was false; (3) the debtor made the misrepresentation with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on the misrepresentation; and (5) the creditor sustained damages as a proximate result of the misrepresentation having been made.

Corso v. Walker (In re Walker), 439 B.R. 854, 860 (Bankr. W.D. Pa. 2010)(citing Webber v. Giarratano (In re Giarratano), 299 B.R. 328, 334 (Bankr. D. Del. 2003), and Chase Bank USA, N.A. v. Ritter (In re Ritter), 404 B.R. 811, 822 (Bankr. E.D. Pa. 2009)), aff'd sub nom. Corso v. Walker, 449 B.R. 838 (W.D. Pa. 2011).[10] See also Martin v. Melendez (In re Melendez), 589 B.R. 260, 265 n.6 (Bankr. E.D. Pa. 2018)(combining first and second elements).

" '[W]ords, both written and oral; conduct; and even omissions may all be found to constitute a material misrepresentation.' . . . A plaintiff, however, 'must demonstrate that the representation was one of existing fact and not merely an *opinion,* expectation or declaration of intention.' " In re Johnson-Battle, 599 B.R. at 783 (italics in the original)(internal citation and footnote omitted).

---

[10] In In re Walker, this Court set forth the quoted language as the requirements to prevail on a section 523(a)(2)(A) nondischargeability claim generally. Given the Supreme Court's holding in Husky Int'l Elecs., Inc., this Court recognizes that such statement may be overbroad as at least one of those elements (false representation) is unnecessary to show "actual fraud." Nonetheless, the Court is not aware of any reason to deviate from the stated elements to show nondischargeability predicated on false representation. Nor have the Parties argued that any contrary standard applies. See Mansfield Pretrial Memoranda 4 (citing In re Walker, 439 B.R. at 860-861 for section 523(a)(2)(A) standard).

**V.**
**Analysis of the Case in Light of Standards and Burdens of Proof**

**a.**
**The Debtor Made a False Representation**

As indicated above, to succeed on her section 523(a)(2)(A) claim, Ms. Mansfield must first show that the Debtor made a false representation.

In this matter, Ms. Mansfield alleges that the Debtor generally made two misrepresentations: (1) that the Debtor promised to place the Loans for Amanda in both of their (Ms. Mansfield's and the Debtor's) names, and (2) that throughout the Loan application period and through the time of the Parties' separation, the Debtor represented to Ms. Mansfield that the Loans had indeed been made in both names. See Mansfield Pretrial Memoranda 5. See generally Mansfield Affidavit.

Unsurprisingly, the Debtor disputes that these representations were made. The question of whether the Debtor made these representations, along with whether the Debtor was the party who actually applied for the Loans in Ms. Mansfield's name, are significant points of contention between the Parties.

The gist of the Parties' respective positions is as follows. The Debtor contends that it was initially the plan to put the student loans for Amanda in his name alone. However, after his Parent PLUS loan application was denied in 2011, the Loans were placed in Ms. Mansfield's name by Ms. Mansfield herself. The Debtor denies ever having applied for the Loans in Ms. Mansfield's name, or even assisting her with that process.

17

Ms. Mansfield disagrees, averring that it was always the Debtor who applied for student loans for both of their children. It has been represented that Ms. Mansfield granted authority to the Debtor to sign the loan applications on her behalf because she was very ill, she was working many hours, she did not understand the student loan application process and was frustrated by it, and the Debtor had more experience with the process. Ms. Mansfield generally contends that permission to sign her name to secure the Loans was conditioned on the obligations being joint.

Though the trial exhibits were voluminous, little physical evidence was presented which directly supports either party's position. The Court was presented with no copies of contemporaneous written communications between the Parties in which applying for the Loans was discussed. Nor is there anything to indicate which party physically entered the keystrokes necessary to submit the Loan applications.[11] One relevant piece of physical evidence is an email from Federal Student Aid which references the Debtor being declined a Parent PLUS loan in 2011. This supports the Debtor's assertion that he did apply for a Parent PLUS loan in his name prior to Amanda's freshman year of college.

In the absence of significant physical evidence, the Court must rely on the testimony presented. For this matter the Parties presented their own testimony,

---

[11] Of course, the Master Promissory Note bears Ms. Mansfield's name and information, but she contends that it was the Debtor who completed and submitted that form. See Mansfield Exhibits 56.

as well as the testimony of Amanda Swiger, their daughter, and Scott Kasbee, Esq., the Debtor's divorce attorney.[12]

In short, Amanda Swiger testified that on at least two occasions she and her father (the Debtor), completed the online applications for her student loans together.  That during this process, she personally observed the Debtor put Ms. Mansfield's name on the Loan applications, and that the Debtor had access to the PIN necessary for the application process.  However, Ms. Swiger could not testify as to what her mother (Ms. Mansfield) did or did not know at the time of the applications.

In view of the evidence presented, including the testimony, the Court exercises its judgment and finds more credible Ms. Mansfield's testimony that it was the Debtor, and not her personally, who applied for the Loans, and also finds more credible Ms. Mansfield's testimony that the Debtor had promised to apply for the Loans jointly and continued to represent that the Loan obligations were joint through the Parties' separation.

 Specifically, the Court is persuaded by Ms. Mansfield's testimony that due to her frustration and lack of experience with the student loan process, and given her husband's experience in applying for his own student loans, as well as his job teaching economics—both of which led Ms. Mansfield to believe that the Debtor had "a better understanding than [she] did in this arena[,]"—that responsibility for the Loan applications was delegated to the Debtor. <u>See</u> Hr'g Tr.

---

[12] Attorney Kasbee's testimony primarily concerned whether a fraud claim was identified in the divorce action.

21-22. Also, persuasive is Amanda's testimony that she witnessed her father apply for the Loans in Ms. Mansfield's name and observed his access to the household files on the Loans. This lines up with Ms. Mansfield's later testimony that the Debtor maintained "meticulous files" in a keyed file cabinet. Hr'g Tr. 132:17-22.

Moreover, while Ms. Mansfield openly testified to facts detrimental to her case (such that she was aware that the 2011 loan would solely be in her name) and facts which placed her in a less-than-flattering light (ex. her divorce counsel referring to her with an expletive), the Debtor's testimony appears to be entirely self-serving and at-points inconsistent. For example, the Debtor testified that he worked with Amanda to apply for her FAFSAs (i.e. her personal student loans)(Hr'g Tr. 89:2-5) and while he could not remember the process exactly, the parent portion of the FAFSA was prepared "when I went and sat down with my daughter[,]" (Hr'g Tr. 105:4-12). However, the Debtor later testified that, "I think Ms. Mansfield and I actually did sit down and do some of those [the FAFSAs] together, of Amanda's." Hr'g Tr. 113:14-24. But although his memory appeared fuzzy on that, he was adamant he did not assist Ms. Mansfield with completing the Parent PLUS student loan applications (although, as the Court pointed out, that the Parent PLUS loan could be requested while completing the FAFSA). Hr'g Tr. 105-106 & 113-114.

At another point, the Debtor testified affirmatively to having had a conversation with Ms. Mansfield regarding his ability to provide Parent PLUS

loans after his 2011 denial—a significant point in his defense—but upon the

Court's inquiry admitted that part of that conversation did not occur.

| | |
|---|---|
| The Court: | So, let's -- according to that exhibit referenced by [Debtor's Counsel], the e-mail kind of confirmation from Direct Loans that you were declined a Parent PLUS loan in July 26, 2011, when you received the declination what exactly did you do? |
| The Debtor: | I called Ms. Mansfield. I told her I was denied, I can't do these loans. |
| The Court: | And then what happened? |
| The Debtor: | She got mad. |
| The Court: | And then what happened? |
| The Debtor: | We said that the Parent PLUSes are going to have to be in her name moving forward because I can't do them. |
| The Court: | Are you guessing that answer or did you actually have that conversation? |
| The Debtor: | We conversed over the fact that I was declined and, to the best of my knowledge, I could no longer -- |
| The Court: | You understand you're testifying -- |
| The Debtor: | -- go forward on -- |
| The Court: | -- here -- you're testifying, you know, under oath? |
| The Debtor: | Mm-hmm. |
| The Court: | Did you have that conversation with Ms. Mansfield? |
| The Debtor: | I had a conversation with Ms. Mansfield over the topic of I could no longer provide Parent PLUSes in Amanda's name because of my adverse credit history. |
| The Court: | And did you have the followup conversation, which is what do you do then because the education need to be financed? |
| The Debtor: | No, we did not. |

Hr'g Tr. 111-112.

Additionally, this Court notes that in prior legal proceedings, the Debtor's testimony had been found "incredible." *Master's Report and Recommendation* 5, Ex. 2 to *Defendant's Answer to Plaintiff's Complaint to Determine Dischargeability*, 19-02009-JAD, ECF No. 4 ("Husband testified that he thought that the student loan was in a two (2) year deferment period, which the Master found to be incredible in light of the text messages between the parties . . . , wherein Wife informed Husband in September 2017 that the lender only granted a three (3) month deferment")(internal citation omitted).

Moreover, the Debtor's deposition testimony that he did not recall asking Ms. Mansfield to consolidate the Loans appears disingenuous in light of the e-mail and text exchanges admitted at trial, as well as the Debtor's testimony at the Enforcement Hearing just under eight months prior that Ms. Mansfield "did exactly what [he] asked her to do[,]" in obtaining the 30-year consolidated loan term. Enforcement Hr'g Tr. 80:4-11.

The final "red flag" the Court will address with respect to the Debtor's credibility is the fact that any physical documentation, if it existed, pertaining to the Loans was destroyed in the lead-up to or aftermath of the Parties' separation. While the Debtor testified that he did not know which party took possession of the Loan documentation and subsequently destroyed it, the Court finds it more plausible that it was the Debtor who removed and disposed of the files. This conclusion is in accord with Ms. Mansfield's testimony regarding discovering the household files missing after meeting with her attorney and having to obtain tax

information from the government. Hr'g Tr. 131:21-24. Additionally, although the Debtor does not recall destroying any documentation pertaining to the Loans, he testified that he destroyed "anything that was in [his] name." Hr'g Tr. 111:14-16.

Accordingly, the Court finds that Ms. Mansfield has preponderantly shown that the Debtor was the party who applied for the Loans in her name.

Ms. Mansfield has also shown that the Debtor, at times, represented to her that the Loans would be and had been applied for jointly. As all of the Loans were ultimately placed in Ms. Mansfield's name, these representations are false.

**b.**
**The Debtor Knew the Representations Were False**

Next, Ms. Mansfield must preponderantly show that that the Debtor knew that the representations were false when he made them.

Intrinsic to this discussion is the timing of the representations. In this regard, Ms. Mansfield testified as follows:

| | |
|---|---|
| The Court: | Is it your testimony that Mr. Bradley Swiger made an affirmative statement to you about Amanda's student loans that turned out to be false? |
| Ms. Mansfield: | Yes. |
| The Court: | What was that statement and when was it made? |
| Ms. Mansfield: | That these were going to be done with both of us, that the loans were supposed to be for both of us and we were both responsible for them. |
| The Court: | And when was that statement made? Would this have been -- |
| Ms. Mansfield: | Yes -- |
| The Court: | -- made before Amanda started her freshman year in school, sophomore year in school, junior year, senior year? |

Ms. Mansfield:    It should have been definitely before the first semester when she was in Saint Francis and then, again, when she was switching universities. I'm sure we had conversations about it because I, again, like you said, the prices were different and she was no longer getting the benefits from having come a [sic] Catholic school into another Catholic school that they were giving her. So, these were ongoing, it's not like, you know, we never talked about it cause we did, and it was in his realm to do it.

Hr'g Tr. 47-48.

Not to be lost in this discussion is the fact that the Debtor informed Ms. Mansfield during the application period in 2011 that he had been denied a Parent PLUS loan and therefore, could not be a signor to the fall 2011 loan. Accordingly, Ms. Mansfield understood that the 2011 loan would be solely in her name.

However, Ms. Mansfield testified that after the 2011 loan (i.e. "after the time in which he was declined"), the Parties had further discussions regarding whose names the Loans would be in going forward and that "it was supposed to, again, still be in both of our names, and he never said that he was declined ever again." Hr'g Tr. 50:3-19.

Ms. Mansfield additionally testified that in 2012 the Debtor affirmatively stated that the Loans would be in both Parties' names. Hr'g Tr. 50:9-12. Moreover, while Ms. Mansfield could not conclusively state that it was discussed "all four years," that the Loans would be in both names was "definitely talked about . . . throughout." Hr'g Tr. 50:9-16.

In summary, Ms. Mansfield's testimony is that the Parties discussed that the Loans would be joint prior to the 2011 loan, but then the Debtor informed

Ms. Mansfield that he could not be an obligor at that time and she was aware that she would be sole obligor on the fall 2011 loan. However, after that the Parties discussed that the Loans going forward would be joint and the Debtor represented that they were.

Immediately, the Court can conclude that Ms. Mansfield has not shown that any representation that the 2011 loan would be joint was made when the Debtor knew it to be false. Although it was not affirmatively stated on the record that the Debtor's representation was made prior to the Debtor being denied a Parent PLUS loan, logic dictates that it was. Especially considering that the Debtor informed Ms. Mansfield of his denial upon receipt of that information. Hr'g Tr. 111:17-22. As such, there is nothing to show that the Debtor knew he could not be an obligor on the 2011 loan when the representation was made.[13]

However, it is a different story with the representations regarding the subsequent Loans.

After the Debtor was denied a Parent PLUS loan in 2011, he was aware that his ability to be an obligor on the Loans going forward was, at best, questionable.  However, any question of whether the Debtor's assertions that the Loans *would be* joint going forward could be mere statements of expectation or declarations of intent (see In re Johnson-Battle, 599 B.R. at 783) is vitiated by the fact that the Debtor testified that after the 2011 denial, he never applied for a Parent PLUS loan for Amanda again. Because the Debtor took no steps to try

---

[13] Moreover, as Ms. Mansfield acknowledged that she was aware that she would be solely liable for the 2011 loan, it could not reasonably be said that Ms. Mansfield relied on any assertion that the 2011 loan would be made joint.

to be an obligor on the Loans after 2011, the Court finds that the Debtor knew it was false when he made the representation that the post-2011 Loans would be joint. Specifically, that he had no intention of applying for any of the Loans post-2011.

More straight-forward, as the Loans had not been put in both names, the representations that the Loans obtained after 2011 had been made joint were also made falsely.

**c.**
**The Debtor Intended to Deceive Ms. Mansfield**

As to the third element of showing fraudulent representation, Ms. Mansfield contends that the Debtor intended to deceive her in making the false representations. See Mansfield Affidavit ¶10.

Because it is unlikely that an actor will admit to a deceptive purpose, intent to deceive may be inferred from the totality of the facts and circumstances. In re Melendez, 589 B.R. at 265-266 (collecting cases). "[W]here a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." Id. at 266 (quoting Strominger v. Giquinto (In re Giquinto), 388 B.R. 152, 166 (Bankr. E.D. Pa. 2008)).

Evaluating the facts and circumstances surrounding the Debtor's representations, the Court finds that in making them, the Debtor intended to deceive Ms. Mansfield. Since the Debtor did not and had no intention to apply for the post-2011 Loans in his name, the only logical reason for the Debtor to represent to Ms. Mansfield that the Loans going forward (after 2011) would be

joint would be for the purpose of securing her consent to sign her name to those Loans.

As for any representation that the post-2011 Loans had been made jointly, knowing this to be untrue, the Debtor's only purpose could be to deceive Ms. Mansfield and prevent her from discovering the truth of the situation.

### d.
### Ms. Mansfield Justifiably Relied on the Misrepresentations

Ms. Mansfield avers that she relied on the Debtor's representation that the Loans would be made joint in granting him permission to sign her name to the loan applications. Mansfield Affidavit ¶7. She also avers that she "justifiably relied on my ex-husband's misrepresentation, that the loans were made joint[.]" Mansfield Affidavit ¶11. By this, the Court takes Ms. Mansfield's position as being that because she relied on her then-husband's representations that the Loans were joint, she was not aware that she was solely liable and therefore took no action to cancel existing or halt future loans—both of which were options under the Master Promissory Note. See Master Promissory Note 2 (setting forth terms by which a loan may be cancelled if timely taken and instructing that an obligor can halt future loans by notifying specified parties that no further loans may be made).

For his part, the Debtor denies that there were any misrepresentations to rely upon. However, at trial the Debtor introduced correspondence from the Loan servicer addressed to Ms. Mansfield. The implication is that she received this mail and therefore, would have been aware that the Loans were solely in her name.

Indeed, as indicated above, the Debtor has produced correspondence from FedLoan Servicing addressed to Ms. Mansfield at her marital residence dated from September 8, 2011 through and after the date of her separation from the Debtor. Included in this correspondence were third-party authorization forms and correspondence regarding loan deferments.

Against this backdrop, the Court must determine whether Ms. Mansfield's averred reliance on the Debtor's misrepresentations was "justifiable." Field v. Mans, 516 U.S. 59, 116 S.Ct. 437 (1995)(for purposes of section 523(a)(2), reliance on a misrepresentation need only be "justifiable" and not "reasonable") As the Supreme Court of the United States observed in Field v. Mans, "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." 516 U.S. at 71 (quoting Restatement (Second) of Torts § 545A, Comment b (1976)).

Thus, the Court will evaluate whether reliance was "justified" specific to Ms. Mansfield and the circumstances that surrounded her during the period that the misrepresentations were made.

Ms. Mansfield testified that she deferred to the Debtor, her then-husband, regarding the Loans.  Afterall, as Ms. Mansfield indicated, not only did the Debtor have contemporaneous experience handling his own educational loans (unlike Ms. Mansfield), but the Debtor had degrees in economics and education. As such, Ms. Mansfield considered the area of student loans to be something within

the Debtor's "knowledge and understanding." Hr'g Tr. 21:11-18. In contrast, the student loan process stressed Ms. Mansfield out as she did not understand it.

Moreover, at the time that the Loans were procured, Ms. Mansfield was experiencing significant health issues, some of which required hospitalization. When not sidelined by illness, Ms. Mansfield was working upwards of seventy hours per week to help support the Debtor through obtaining his Doctoral Degree, "to keep our kids in school to help them be educated, and if I didn't [work] we couldn't keep a roof over our head." Hr'g Tr. 56-57.

Accordingly, Ms. Mansfield relied on her then-husband, whose word she trusted when he represented that the Loans were taken care of and "everything [was] good." Hr'g Tr. 51:20-25.

With respect to the correspondence from FedLoan Servicing, Ms. Mansfield testified that she did not receive the mail, explaining that the Debtor would get home before her and "took care of the mail, the bills, everything." Hr'g Tr. 40:14-21. Again, indicating her deferential mindset with respect to the Loans as well as other household managerial duties.

 Ms. Mansfield also took this approach with any potential emails from FedLoan Servicing, testifying that although she did not recall receiving them, it does not mean that she did not. As Ms. Mansfield explained, ". . . I didn't look at most of that stuff. I was working like 70 hours a week and I was sick . . . I didn't just sit and pay attention to all the finite details because [the Debtor] was caring for them, and I trusted that what he said was actually happening." Hr'g Tr. 56:16-22.

In essence, Ms. Mansfield was an at-times seriously ill and overworked mother, trying to provide for her family, who trusted her husband to take care of financial matters that were perceived to be more in his wheelhouse. And, because she trusted her husband, she did not directly monitor the ongoings of the Loans—instead taking her husband's word that everything was as it should be.

While this is not the most advisable approach from a legal standpoint, the Court does not find that the delegation of duties related to the Loans, and Ms. Mansfield's reliance on her husband under these circumstances, was unjustified.

At trial, the Debtor admitted into evidence correspondence concerning deferments of the Loans that were obtained prior to the Parties' separation. The inference is that, unlike the other notices from the Loan servicer, that deferments were obtained suggests that Ms. Mansfield was actively involved in the Loans. The Court is not persuaded.

The *William D. Ford Federal Direct Loan Program Direct PLUS Loan Borrower's Rights and Responsibilities Statement* attached to the Master Promissory Note, contains a provision regarding "Deferment and forbearance," which provides that "You may receive a deferment: . . . While the student for whom you obtained a Direct PLUS Loan is enrolled at least half time at an eligible school[.]" Master Promissory Note 8 ¶ 21. Moreover, that:

> You may receive a deferment while you are enrolled in school on at least a half-time basis . . . if (1) you submit a deferment request form to your servicer along with documentation of your eligibility for the deferment, or (2) your servicer receives information from the school you are attending that indicates you are enrolled at least half time. If your servicer processes a deferment based on information received

30

> from your school, you will be notified of the deferment and will have
> the option of canceling the deferment and continuing to make
> payments on your loan.

Id.

Nothing has been presented to show that the deferments were requested by Ms. Mansfield (or anyone acting on her behalf) as opposed to being placed based on the servicer's receipt of information that Amanda was enrolled at least half-time. In fact, the Court's examination of the FedLoan Servicing correspondence suggests the opposite.

For example, at trial the Debtor highlighted the letter from FedLoan Servicing dated June 18, 2013. Hr'g Tr. 32. In that letter, FedLoan Servicing wrote in part that: "We received information regarding your eligibility for a deferment on your student loan(s)." Debtor's Exhibits at ECF p. 200. However, in the letter sent just prior dated May 22, 2013, FedLoan Servicing notified Ms. Mansfield that: "We recently adjusted your account based on new enrollment information *we received from your school*. . . . These adjustments may have affected . . . existing deferments and forbearances on your loans." Debtor's Exhibits, ECF p. 197 (italics added). Further that, "Typically minor adjustments due to temporary status changes, such as summer vacation or school transfers, will be automatically updated by your school at the start of the next term." Id.

This strongly suggests that the deferment noticed in the subsequent letter (the June 18, 2013 letter) was applied automatically upon receipt of Amanda's enrollment information. The Court notes that the same notice language contained in the June 18, 2013 letter, was also included in the nearly identical

letters dated October 3, 2012, December 29, 2012, and February 13, 2014 which were also highlighted at trial.[14]

However, even assuming that the deferments were manually requested, the Court observes that as it was possible for the deferments to be requested online[15] and as it has been found that the Debtor had online access to Loan accounts by virtue of his completing the Loan applications, there is nothing to indicate that it was anyone but the Debtor who would have requested such deferments.

On a final note related to the reliance prong, the Debtor argues that due to federal student aid policies, that it was not possible for both the Debtor and Ms. Mansfield apply for the Loans jointly. Whether true or not, however, nothing was shown to indicate that Ms. Mansfield was aware of this limitation and thus, it had no bearing on her reliance on the Debtor's misrepresentations.

### e.
### Ms. Mansfield Sustained Damages as a Result of the Misrepresentations

Ms. Mansfield alleges that she has sustained damages as a proximate result of the Debtor's misrepresentations in the total amount of the Loans. Mansfield Affidavit ¶11.

---

[14] The letters are comprised of four pages each, with the first, second, and fourth appearing to have identical, form language. The third page contains specific loan details and varies between the letters. Compare letters at Debtor's Exhibits, ECF No. pp. 189-196, 200-203, & 212-219.

[15] See, e.g. January 12, 2012 Letter at 3, Debtor's Exhibits at ECF p. 152 ("In some cases, you may even be able to apply for a deferment or forbearance completely online.")

As the outstanding balance of the Loans is fluctuating, the Court will refer to the Loans by date instead of amount.[16]

The Loans for Amanda were disbursed on the following dates: October 10, 2011, January 15, 2012, August 22, 2012, August 18, 2013, and August 18, 2014.

Immediately, having found that Ms. Mansfield has failed to preponderately show that the representations with respect to the October 2011 loan were falsely made (or that Ms. Mansfield could have justifiably relied on any misrepresentation related thereto due to her knowledge that she would be and was solely obligated on that loan), no damages can be found with respect to the October 10, 2011 loan.

The remaining loans are a different matter.

Most straight-forward, Ms. Mansfield's consent for the Debtor to apply for the post-2011 Loans in her name was conditioned upon the Debtor being jointly liable. Without the representations that the Loans would be joint, the post-2011 Loans would not have been made and Ms. Mansfield would not be obligated on those amounts. Thus, Ms. Mansfield has been damaged in those amounts.

In assessing whether Ms. Mansfield sustained damages as a proximate result of the Debtor's misrepresentations that the post-2011 Loans would be and had been applied for jointly, the Court is cognizant that upon questioning by the Court as to what her course of conduct would have been if the Debtor had

---

[16] The total amount outstanding on the Loans as of September 26, 2018 was $75,380.63 (Mansfield Affidavit ¶11), whereas at trial Ms. Mansfield testified that the amount due on the Loans was $83,489 as of September 12, 2023. Hr'g Tr. 19-20.

informed her that he had been declined a Parent PLUS loan subsequent to his 2011 denial and was unable to jointly execute the Loans going forward, Ms. Mansfield did not outright reject the possibility of executing the loans solely in her name, but the Court does not find this sufficient to rebut her prima facie showing of damages.

It is true that Ms. Mansfield could have ultimately ended up solely responsible for the post-2011 Loans by her choice, but in falsely representing that the Loans would be made joint, the Debtor deprived Ms. Mansfield the chance to seek out other opportunities to obtain funding. As she testified, she "probably would have ended up going to a bank [her]self and trying to see what, if any, options were out there privately . . . ." Hr'g Tr. 133:14-19.

Moreover, in representing to Ms. Mansfield that the post-2011 Loans had been made joint, the Debtor prevented Ms. Mansfield from taking any action to either cancel the existing loans or prevent future loans from being created in her name as referenced above.

Accordingly, Ms. Mansfield has sustained damages as a proximate result of the Debtor's misrepresentations that the Loans would be and had been made jointly, but only with respect to the loans disbursed after (and not including) October 10, 2011.

# VI.
## Conclusion

In sum, the Court finds that the Debtor has preponderantly[17] shown that the Debtor falsely represented to Ms. Mansfield that the post-2011 Loans would be made in both Parties' names and were joint obligations of the Parties.

In particular, the Court finds more credible Ms. Mansfield's testimony, that it was the Debtor who applied for the Loans, and that he made the misrepresentations.

As the post-2011 Loans were made solely in Ms. Mansfield's name, the representations that they would be and had been made jointly were false. The Debtor—who lacked an intent to apply to be an obligor on the Loans post-2011 and being the person who applied for the Loans, knew the representations were false when they were made and made them with the intent to deceive Ms. Mansfield.

Given the circumstances existing at the time the Loans were obtained— that is, that Ms. Mansfield was ill, working long hours, and considered herself less knowledgeable than her husband who had experience with obtaining

---

[17] The Parties have not disputed that the plaintiff bears the burden of proof in a case such as this and must prove the elements of its nondischargeability claim by a preponderance of the evidence. Larson v. Bayer (In re Bayer), 521 B.R. 491, 499 (Bankr. E.D. Pa. 2014); Lindner v. Berry (In re Berry), Nos. 11-20346-JAD, 11-2291-JAD, 2012 WL 4739405, at *4, 2012 Bankr. LEXIS 4668, at *9 (Bankr. W.D. Pa. Oct. 2, 2012)(citing Grogan v. Garner, 498 U.S. at 285). See Mansfield Pretrial Memoranda 4 (citing In re Walker, 439 B.R. at 860-61, wherein Grogan v. Garner is cited for the preponderance of the evidence standard). To the extent any party believes a different burden of proof applies, see, e.g., Weissberger v. Myers, 90 A.3d 730 (Pa. Super. 2014), no party has made such a contention and therefore such argument has been waived and/or forfeited. See Groom v. Krook (In re Krook), 615 B.R. 479, 485 n.4 (Bankr. N.D. Ill. 2020)("[i]t is not the court's job to make parties' arguments for them")(quoting Furry v. United States, 712 F.2d 988, 994 n.1 (7th Cir. 2013); see also Hojnacki v. Klein-Acosta, 285 F.3d 544, 549 (7th Cir. 2002) (it is not the court's job to formulate arguments for the parties).

student loans, it was justifiable for Ms. Mansfield to agree to delegate the job of applying for Amanda's student loans to the Debtor and to rely on her then-husband's promises and representations regarding their status.

Finally, because Ms. Mansfield's consent to sign her name to the post-2011 Loans was conditioned on those loans being joint obligations, and because the representations that the Loans had been made joint prevented Ms. Mansfield from potentially taking action to eliminate or mitigate the post-2011 Loan obligations solely in her name, Ms. Mansfield has sustained damages in the amounts of those Loans.

Accordingly, any amounts attributable to the portion of the Loans made after October 10, 2011 are nondischargeable.

Dated:  March 7, 2024

_____
Jeffery A. Deller        jsf
United States Bankruptcy Judge

Case Administrator to Mail to:

Debtor
Rodney D. Shepherd, Esq.
Mary Bower Sheats, Esq.
Ronda J. Winnecour, Chapter 13 Trustee
Office of the United States Trustee